UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                       :

EDGAR CARHUAPOMA,
                   Plaintiff,  :

                       :        11 Civ. 8670 (JPO) (RLE)

         -against-       :

                       :         MEMORANDUM
NEW YORK-PRESBYTERIAN HEALTHCARE  :        AND ORDER
SYSTEM, INC. d/b/a NEW YORK-       :
PRESBYTERIAN HOSPITAL WEILL CORNELL:
MEDICAL CENTER             :
                       :
              Defendant.  :
                       :
-------------------------------------------------------------- X

J. PAUL OETKEN, District Judge:

      This is an action for unpaid overtime wages pursuant to the Fair Labor Standards Act, 29

U.S.C. § 201 *et seq*. ("FLSA")*,* and the New York Labor Law ("NYLL").  New York

Presbyterian Hospital, Weill Cornell Medical Center ("Defendant" or "the Hospital") has moved

for summary judgment, contending that Plaintiff is exempt from receiving overtime payments

under the executive and administrative employee exemptions to FLSA.  For the reasons that

follow, Defendant's Motion for Summary Judgment is denied.

**I.**     **Background**

     **A.**     **Factual Background**[1]

          **1.**     **The Team Leader Positions**

      From May 2008 through July 2011, Edgar Carhuapoma ("Plaintiff") was employed as one

of ten salaried Team Leaders in the Food and Nutrition Department (the "Department") at the

---

[1]The following facts are drawn from the parties' depositions, affidavits, and other submissions
filed in connection with the motion for summary judgment.  The facts are construed in the light
most favorable to the non-movant, Plaintiff.

Hospital.  (Dkt. No. 22 ("Weiner Decl."), Ex. A ("Carhuapoma Dep.") at 9:3; Dkt. No. 21 ("Lee Aff.") at ¶¶ 6-7.)  The ten Team Leaders were staffed in the kitchen ("the Kitchen Team Leaders"), the cafeteria ("the Cafeteria Team Leaders"), patient food services ("the Tray Line Team Leaders"), and menu processing units of the Department.  (Lee Aff. at ¶ 5.)  The Team Leaders reported to one of two managers, who in turn reported to the Director.  (*Id.*)

### 2.      Plaintiff's Team Leader Positions

Over the course of his employment at the Hospital, Plaintiff had three separate Team Leader positions.  Those positions and his responsibilities in each are outlined below.

### a.      Kitchen Team Leader

From May 2008 to December 2009, Plaintiff worked as a Kitchen Team Leader, although Plaintiff testified that a more adequate title for his position at that time would have been "chef's helper."  (Carhuapoma Dep. at 16:17.)  Initially, Plaintiff's responsibilities consisted of "mak[ing] sure that the temperatures were correct on the food . . . [and] that employees were doing their jobs and filling out their time sheets . . . and [doing] paperwork . . . for the employees."  (*Id.* at 17:2-11.)  Plaintiff spent "three percent" of the workday on "testing the food preparers on their skills, abilities and knowledge of [the] Hospital's established and inflexible procedures."  (Dkt. No. 25 ("Carhuapoma Aff.) at ¶ 10.)

In his first months as a Team Leader, seven employees reported to Plaintiff.  (Carhuapoma Dep. at 17:16.)  Plaintiff followed the directives of the Chef, or his manager, Michael DeFilippo ("DeFilippo"), when the Chef was not available.  (*Id.* at 18:12-20:22.)  Plaintiff also followed the directives of a manual that laid out the policies and procedures of the kitchen; his job was to "make sure [they] follow[ed] all these steps T-by-T and g[ot] the job done."  (*Id.*)  If any employees were not following the manual, Plaintiff would "go and tell the chef."  (*Id.*)  Plaintiff

also "encourage[d] improvements in the production areas," and "ma[de] sure they wash their hands before they cook and during food preparation to ensure the safety of each meal."  (Lee Aff., Ex. M. at 1-2.)

Plaintiff took over the responsibilities of the Executive Chef about three months into his employment, but he did not take on the title.  (Carhuapoma Dep. at 25:10-26:7.)  During that time, Plaintiff's hours became "longer and longer" because he "started cooking" and "had to do the orders," meaning he would order food for the kitchen based on spreadsheets in his manual.  (*Id*. at 27:4-28:9.)  Even at this time, however, Plaintiff remained closely supervised.  His manager, DeFilippo, "would tell me what to order; what the par levels were; what I was cooking."  (*Id.*)  When Plaintiff saw that employees were not performing their jobs correctly, he would report them to his manager; he did not take any initiative because it "wasn't part of [his] protocol."  (*Id.* at 26:2-22.)

### b.      Tray Line Team Leader

In January 2010, Plaintiff became a Tray Line Team Leader, a position he would hold for about one year.  (Carhuapoma Dep. at 32:10-33:8; 44:2-4.)  Part of Plaintiff's job was to make sure food was plated "according to the procedure book."  (*Id.* at 41:21-23.)  Plaintiff would also plate food himself when employees called out; according to Plaintiff, it was rare for all the plating employees to show up to work.  He thus spent, on average, "7.5 hours per day of [his] twelve-hour shift . . . plating food with the assistants who reported to [him]."  (*Id.* at 42:8-43:15; Carhuapoma Aff. at ¶ 25).[2]  Plaintiff "was not in charge of the tray line," but rather "[t]he

---

[2] DeFilippo disputes that Plaintiff "worked on the tray line on a daily basis.  Filling trays with food was not one of the responsibilities of the tray line Team Leader . . . ."  (DeFilippo Aff. at ¶ 4.)

assistant manager sets forth in a book how the tray line is to operate and [Plaintiff] communicate[d] these procedures to the other employees working on the tray line." (*Id.* at ¶ 11.)

### c.      Cafeteria Team Leader

In January 2011, Plaintiff became a Team Leader in the Hospital's cafeteria. (Carhuapoma Dep. at 46:12-18.)  During this period, seven servers reported to Plaintiff.  (*Id.* at 48:24.)  The cafeteria opened at 7:00 am and closed at 8:00 pm.  (Lee Aff. at ¶ 12.)  One Team Leader was staffed through the first half of the day, one in the second half.  (*Id.*)   It appears that Plaintiff alternated between these shifts.  (Carhuapoma Dep. at 44:19-45:3; *but see* Lee Aff. at ¶ 12.)

According to the written job description, a Cafeteria Team Leader "[p]lans, organizes, and monitors the daily preparation and service of foods from the cafeteria, vending, satellite carts, and special function areas."  (Job Description at 1.)  He also "[m]aintains established policies and procedures in order to insure that appropriate fiscal controls are maintained," and "[e]valuates cafeteria activities and initiates or recommends changes in order to improve service."  (*Id.*)

While in the cafeteria, Plaintiff supervised assistants who handled the food and maintained the service stations, as well as the "box boys," who "b[r]ought in all the dry condiments from downstairs," "thr[ew] away all the trash," and "cleaned up the place."  (Carhuapoma Dep.. at 48-52:3.)  On the morning shift, he "ma[de] sure that everything the night prior got ordered, that the food was upstairs, that the food was hot enough, that we had enough salads, we had enough condiments, the cashiers had their money and to monitor the servicing [sic] size of the line."  (Carhuapoma Dep. at 46:12-18.)  Plaintiff was also generally responsible for safeguarding the cash box for the cash registers.  (*Id.* at 52:22-53:13.)  When he saw employees not properly

performing their assigned tasks correctly he would report that fact to his supervisor, rather than taking any disciplinary actions himself.  (*Id*. at 47:24).

### 3.      Plaintiff's General Responsibilities as a Team Leader

The "General Summary" section of a Team Leader's job description states that a Team Leader "[s]upervises and coordinates the daily operations of employees in an assigned area to ensure safe, accurate, timely and cost effective preparation and services of food items to patients and staff."  (Lee Aff., Ex. A ("Job Description"), at 1.)  The job description further states that a Team Leader:

> 1. Interviews, orients, trains, assigns, monitors, and evaluates employees.  Interprets policies and procedures ensuring that staff adheres to quality controls and standards.  Evaluates performance and recommends personnel actions to coordinator or appropriate others, e.g. promotions, transfers, disciplinary actions when necessary . . . .
>
> 4. Maintains effective inter/intra departmental communication with management, peers, subordinates, and students to resolve or prevent food service problems.  Demonstrates and sets an example of appropriate customer relations skills including adherence to dress code as appropriate.  Trains and rates performance of employees regarding customer relations procedures and standards . . . . Assumes delegated responsibilities of coordinator or appropriate other during temporary absence.

(*Id.* at 2.)[3]

---

[3] A job description is probative evidence, but only to the extent that it reflects an employee's actual duties.  "Whether an employee is exempt is determined by the employee's actual work activities, not by the employer's characterization of those activities through a job title or job description."  *Pippins v. KPMG LLP*, No. 11 Civ. 0377 (CM) (JLC), 2012 WL 6968332, at *16 (S.D.N.Y. Nov. 30, 2012), *reconsideration denied by* 2013 WL 466144 (S.D.N.Y. Feb. 7, 2013); *see also McBeth v. Gabrielli Truck Sales, Ltd.*, 768 F. Supp. 2d 383, 387 (E.D.N.Y. 2010) ("An employee['s] exempt status depends less on his title, and more on the actual duties performed.")

During his employment, Plaintiff ran "huddles," or meetings, with his subordinates on a daily basis.  At those huddles, Plaintiff gave employees "instructions that [his managers] passed down" (*id.* at 89:23-25) and "coach[ed]" them (*id.* at 105:14).[4]  According to one of Plaintiff's Performance Reviews, at these meetings Plaintiff "encouraged [his subordinates] to improve themselves both mentally and physically in the work environment and "constantly t[old] his coworkers that there was nothing wrong with going beyond their regular duties."  (Lee Aff., Ex. M. at 1.)

While working in the cafeteria and the kitchen, Plaintiff filled out performance evaluations for his subordinates.  (Carhuapoma Dep. at 96:10-14.)  Plaintiff testified that he would prepare a handwritten "rough draft" of the evaluations, and send them to DeFilippo, who would make "corrections," meaning he would "polish up the language," and then change ratings that he disagreed with.  (*Id.* at 100:5-101:11; 118:5-22.)  Often, Plaintiff's ratings would be "knocked down" for "absents, callouts, lateness, not showing up," as company policy mandated; at times, DeFilippo also made substantive changes based on his own observations of the employee being evaluated.  (*Id.* at 118:23-127:6.)  After the evaluations had been reviewed by Plaintiff's manager and Human Resources, Plaintiff would review the evaluations with his subordinates in "one-on-one" meetings.  (*Id.* at 101:7-14.)  Plaintiff explains that he completed these performance evaluations according to the "specific guidelines" of the Hospital, and thus that he "did not use [his] subjective, discretionary judgment to evaluate how assistants were performing [their] duties."  (*Id.* at ¶ 16.)

---

[4] In his Affidavit, Plaintiff states that when he testified to coaching other employers in his deposition, he was "referenc[ing] . . . communicating to the employees who report to me the information my managers wanted me to pass along."  (Carhuapoma Aff. at ¶ 22.)

Plaintiff was not involved in the interviewing process.  (Carhuapoma Dep. at 131:24.)
Nor did he have the authority to hire or fire his subordinates.  (Carhuapoma Aff. at ¶ 19.)
According to Lee, "Plaintiff . . . disciplined assistants by issuing oral and written warnings" and
also "had the authority to suspend, or place employees 'off duty' and send them home pending
further investigation, whenever a disciplinary issue arose that required immediate attention."
(Lee Aff. at ¶ 26.)  Lee states that Plaintiff did not need to "seek approval of his supervisor or
higher management before taking such action."  (*Id.*)  According to Plaintiff, however, he would
"issue written performance warnings to employees only when [he] was directed to by [his]
superior," and he was only permitted to place employees "off duty" for committing certain "very
specific . . . type[s] of conduct" enumerated by management.  (Carhuapoma Aff. at ¶¶ 13-14.)
According to Plaintiff, his "role in an employee being promoted, demoted, or disciplined is to
provide the necessary information to [his] supervisor and human resources so that they can make
the ultimate decision."  (*Id.* at ¶ 20; *see also* Carhuapoma Dep. at 131:14-15.)

Plaintiff's role in performing administrative duties is in dispute.  According to Plaintiff, he
spent approximately ten minutes of his day performing administrative duties.  (Carhuapoma Aff.
at ¶ 18.)  According to Lee, however, "Plaintiff performed significant administrative functions,"
such as "maintain[ing] and order[ing] the Department's inventory to maintain pantry stock at
appropriate levels," and that Plaintiff was charged with "completing other paperwork relating to
the operation of the units he managed."  (Lee Aff. at ¶ 33.)  Plaintiff had the use of an office to
perform administrative duties.  (*Id.* at ¶ 30.)

### 4.      Plaintiff's Salary

Throughout his employment at the Hospital, Plaintiff's weekly salary was consistently
above $880.  (Lee Aff., Ex. B. at 1-7.)  Plaintiff's total compensation in 2009 "exceeded $46,000,

whereas the average cook or production assistant in the kitchen at the time made $39,100."
(DeFilippo Aff. at ¶ 8.)  Plaintiff's hourly wage, as compared to the wage of other employees, is
not apparent from the record.  What is clear is that Plaintiff worked longer hours than other
employees.

At different times during Plaintiff's tenure at the Hospital, he was paid a discretionary
bonus that was approved solely for the "[h]ospital's management exempt population."  (Lee Aff.,
Dkt. No. 21, Ex. C. ("Bonus Memo").)  For example, Plaintiff received discretionary bonuses in
the amount of $500 in March 2009 and $300 in March 2010.  (Lee Aff., Dkt. No. 21, Ex. D.)
According to the Bonus Memo, "[t]he award is designed to recognize employees who have
exhibited excellent performance during the year or have achieved a specific performance related
accomplishment."  (Bonus Memo.)

### 5.     Job Training

During his employment, Plaintiff completed several job trainings.  For example, in August
2009, Plaintiff received a "ServSafe Certification" for "successfully completing the standards set
forth for the ServSafe Food Protection Manager Certification Exam" (Lee Aff., Ex. G at 2), and
in November 2009, Plaintiff completed the "Essentials of Leadership" training (*id.* at 1).  During
this training, he was instructed not to "deviate from established . . . guidelines and procedures."
(Carhuapoma Aff. at ¶ 5.)  Plaintiff was also recognized for "all [of his] hard work" when he
received a "WOW" award recognizing Plaintiff for "proactively [taking] the role [of] Chef /
Executive Chef / Team Leader - all at once!"  (Lee Aff., Ex. I.)

Plaintiff trained the employees on particular topics on which he was instructed at his
trainings.  (Carhuapoma Dep. at 93:22-94:4.)  Plaintiff also worked to instill in his subordinates
certain values, including teamwork.  (*Id.* at 106:7-13.)

8

### 6.     Plaintiff's Authority and Discretion

The overarching theme of Plaintiff's deposition and affidavit is that nearly all of his work

as a Team Leader was done in accordance with the Hospital's "established and rigid procedures."

(Carhuapoma Aff. at ¶3).   Elaborating on his testimony that he performed his job "according to

the manual," Plaintiff stated that ""[t]here's a book for everything.   The book tells you what

you're supposed to do . . . ." (Carhuapoma Dep. at 21:3-8.)   These procedures dictated in detail

how Plaintiff should perform his more substantial tasks, such as conducting performance

evaluations, and his smaller takes, such as arranging food on a tray.   Indeed, in his deposition,

Plaintiff testified as follows:

> Q. Have you ever been in a situation where you were a manager
> and you didn't have guidelines to follow to evaluate people?
> A. No.  There's always been guidelines.
> Q. No matter what you do?
> A. Yes.
> Q. In the military?
> A. In the military there are guidelines to a T.   There are always
> guidelines.
> Q: Kind of like the hospital [?]
> A: Yes.

(Carhuapoma Dep. at 161: 4-14.)

### B.     Procedural Background

Plaintiff filed this action on November 30, 2011, on behalf of himself and other similarly

situated current and former employees of the Hospital.  (Dkt. No. 1.)  Plaintiff filed an Amended

Complaint on February 16, 2012.  (Dkt. No. 12.)  The following day, Defendant filed its Answer

to the Amended Complaint.  (Dkt. No. 13.)  On August 22, 2012, Defendant moved for summary

judgment.  (Dkt. No 19; Dkt. No. 23 ("Def.'s Mem.").)  Plaintiff opposed the Motion on

September 13, 2012.  (Dkt. No. 24 ("Pl.'s Opp'n.").)  On September 25, 2012, Defendant replied.

(Dkt. No. 32 ("Def.'s Rep.").)

## II.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, summary judgment "is appropriate when the evidence 'show[s] that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law.'" *Chanel, Inc. v. Veronique Idea Corp.*, 795 F. Supp. 2d 262, 265-66 (S.D.N.Y. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986)) (alteration in original).  In such cases, the non-moving party must respond to the adverse party's pleading with "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.  The Supreme Court has advised that an issue of fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The initial burden of a party moving for summary judgment is to provide evidence on each material element of his claim or defense illustrating his entitlement to relief. *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).  A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.

The Court must view all evidence and facts "in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (citing *Consarc Corp. v. Marine Midland Bank*, 996 F.2d 568, 572 (2d Cir. 1993)).  To prevail on a claim for summary judgment, it must be shown that "no reasonable trier of fact could find in favor of the nonmoving party." *Id.*; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).  The nonmoving party must advance more than mere "conclusory statements, conjecture, or speculation" to successfully defeat a motion for summary judgment. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996) (citing *Matsushita*, 475 U.S. at 587); *see also Anderson*, 477 U.S. at 249-50.

### III.    Discussion

Defendant contends that Plaintiff's jobs at the Hospital fell into both the executive and administrative exceptions of the FLSA.  These exemptions, and their applicability to this case, are examined below.

### A.    FLSA and Its Exemptions

"Congress enacted the Federal Labor Standards Act in 1938 to eliminate 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'"  *Reiseck v. Universal Communications of Miami, Inc.*, 591 F.3d 101, 104 (2d Cir. 2010) (quoting 29 U.S.C. § 202(a)).  "In that effort, the FLSA imposes numerous 'wage and hour' requirements."  *Id.*  The FLSA requires that "no employer shall employ any of his employees who in any workweek . . . work longer than forty hours unless such employee receives compensation . . . at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207 (a)(1).  The FLSA provides for certain exemptions, including for "any employee employed in a bona fide executive [or] administrative . . . capacity."  *Id.* at § 213(a)(1).[5]

"The Second Circuit has held that 'because the FLSA is a remedial act, its exemptions . . . are to be narrowly construed.'"  *Jacob v. Duane Read, Inc.*, No. 11 Civ. 0160 (JPO), 2012 WL 260230, at *3 (S.D.N.Y. Jan. 27, 2012) (quoting *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991)); *see also Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960) (explaining that the exemptions to the FLSA are "narrowly construed against the employers seeking to assert

---

[5] "The NYLL . . . mandates overtime pay and applies the same exemptions as the FLSA." *Reiseck*, 591 F.3d at 105 (citing N.Y. Comp.Codes R. & Regs., tit. 12, § 142-3.2 ("An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and subject to the exemptions of sections 7 and 13 of 29 U.S.C. 201.")).

them and their application limited to those establishments plainly and unmistakably within their terms and spirit").  "Indeed, an employer bears the burden of proving that its employees fall within an exempted category of the Act." *Martin,* 949 F.2d at 614; *see also Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97 (1974) ("[T]he application of an exemption under the Fair Labor Standards Act is a matter of affirmative defense on which the employer has the burden of proof.").

Whether an exemption applies to a particular employee "is a mixed question of law and fact." *Myers v. Hertz Corp.*, 624 F.3d 537, 548 (2d Cir. 2010).  "The question of how the [employees] spent their working time . . . is a question of fact.  The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . ." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).  The Second Circuit "has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances." *Barfield v. New York City Health & Hospitals Corp.*, 537 F.3d 132, 141-42 (2d Cir. 2008).  Because "[w]hether an employee is exempt from the overtime pay provisions is a fact intensive inquiry," *Schwind v. EW & Assocs., Inc.*, 357 F. Supp. 2d 691, 703 (S.D.N.Y. 2005) (internal citation and quotation omitted), "[e]ven where there has been full discovery, courts are often reluctant to grant summary judgment based on [an] exemption . . . ." *Indergit v. Rite Aid Corp.*, No. 08 Civ. 9361 (PGG), 2010 WL 1327242, at *7 (S.D.N.Y. Mar. 31, 2010); *see also Clougher v. Home Depot U.S.A., Inc.*, 696 F. Supp. 2d 285, 290 (E.D.N.Y. 2010) (noting that "courts often rely upon a developed trial record" in making determinations regarding the applicability of exemptions).

12

**B.      The Executive Exception**

In its regulations, the Department of Labor ("the DOL"),[6] has defined the term "employee

employed in a bona fide executive capacity" to mean any employee who is:

> (1) Compensated on a salary basis at a rate of not less than $455 per
> week (or $380 per week, if employed in American Samoa by
> employers other than the Federal Government), exclusive of board,
> lodging or other facilities;
> (2) Whose primary duty is management of the enterprise in which
> the employee is employed or of a customarily recognized
> department or subdivision thereof;
> (3) Who customarily and regularly directs the work of two or more
> other employees; and
> (4) Who has the authority to hire or fire other employees or whose
> suggestions and recommendations as to the hiring, firing,
> advancement, promotion or any other change of status of other
> employees are given particular weight.

29 C.F.R. § 541.100(a); *accord Damassia v. Duane Reade, Inc*., No. 04 Civ. 8819 (GEL), 2006

WL 2853971, at *5 n.7 (S.D.N.Y. Oct. 5, 2006) ("The mere fact that plaintiffs' job

responsibilities differ from, and are more important than, the responsibilities of [other employees]

does not necessarily mean that the requirements of 29 C.F.R. § 541.100 and related provisions are

satisfied. . . . [E]mployees do not become bona fide executives under FLSA simply because there

are employees lower than them in the company's hierarchy.")  The parties agree that elements (1)

and (3) are satisfied, but they dispute the applicability of elements (2) and (4).  The question

---

[6] "The FLSA does not define 'bona fide executive, administrative, or professional' employment,
and instead directs the secretary of Labor to 'define [] and delimit []' those terms from time to
time by regulations."  *Ramos v. Baldor Specialty Foods, Inc.*, 687 F.3d 554,559 (2d Cir. 2012)
(internal quotations and citation omitted) (alteration in the original).  "Issued pursuant to statutory
authority, the DOL's 2004 regulations defining the terms of the FLSA executive exemption '*have
the force of law*, and are to be given controlling weight unless they are found to be arbitrary,
capricious, or manifestly contrary to the statute.'"  *Id.* (quoting *Freeman v. Nat'l Broadcasting
Co.*, 80 F.3d 78, 82 (2d Cir. 1996)) (emphasis added). The DOL regulations concerning FLSA's
overtime provisions "are entitled to *Chevron* deference . . . [r]egardless of whether these rules are
labeled as 'regulations' or 'interpretations' . . . ."  *Scott v. City of New York*, 592 F. Supp. 2d 386
(S.D.N.Y. 2008) (citing *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158 (2007)).

whether Plaintiff's duties were primarily managerial occupies a predominant position in the parties' briefs, and is examined first here.

### 1.        Primary Duty of Management

The DOL regulations define "management" to include a range of activities, such as:

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees; maintaining production or sales records for use in supervision or control; appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold; controlling the flow and distribution of materials or merchandise and supplies; providing for the safety and security of the employees or the property; planning and controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The DOL regulations define "primary duty" as "[t]he principal, main, major or most important duty that the employee performs.  Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole."  29 C.F.R. § 541.700(a).  The regulations provide the following list of  nonexclusive factors to be considered in determining whether an employee's primary duty is management: (1) the amount of time spent on exempt versus non-exempt work; (2) the employee's relative freedom from direct supervision; (3) the relative importance of the exempt duties as compared with the employee's other duties; and (4) the difference between the employee's salary and the pay typically offered for the types of nonexempt work performed by the employee.  *Id*.

### a.   Amount of Time Spent on Exempt Work

The time spent on performing exempt work "can be a useful guide in determining whether exempt work is the primary duty of an employee."  § 541.700 (b).  Indeed, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement," although "[t]ime alone . . . is not the sole test, and nothing in this section requires that exempt employees spend more than 50 percent of their time performing exempt work."  *Id.*

### i.   Cafeteria Team Leader

This factor weighs clearly in favor of Defendant with respect to Plaintiff's time as a Cafeteria Team Leader.  Plaintiff spent the majority of his time while in the cafeteria on managerial tasks, including supervising the assistants who handled the food and maintaining the service stations and the box boys.

### ii.   Kitchen Team Leader

While working in the kitchen, Plaintiff also spent much of his time performing tasks that clearly fall under the umbrella of § 541.102.  For example, he made sure that employees were doing their jobs and filling out their time sheets, made sure that the food prepared in the kitchen was safe to eat, trained and tested employees, and coached employees in daily huddles.  While acting as the Executive Chef, Plaintiff also oversaw "the cooks and other assistants who prepared three meals a day for patients . . . ." (DeFillipo Aff. at ¶ 7.)

Plaintiff did testify, however, that, for most of the time he served as a Kitchen Team Leader, he spent an unspecified portion of his day "cooking . . . actually holding the pans over the fire [himself]," and Plaintiff is entitled to an inference that this was in fact the case.  (Carhuapoma Dep. at 27:4-20.)  In addition, he asserts in his affidavit that, contrary to Defendant's claim that

15

testing the kitchen staff was a major portion of his job, he only spent three percent of his time as a Kitchen Team Leader "testing the food preparers." (Carhuapoma Aff. at ¶ 10.)  While this testimony does not call into question the evidence proffered by Defendant indicating that Plaintiff spent the majority of his time in the kitchen performing managerial tasks, material evidence in the record suggests that manual labor constituted a substantial portion of Plaintiff's job as a Kitchen Team Leader.

### iii.    Tray Line Team Leader

This factor weighs in favor of Plaintiff with respect to Plaintiff's stint as a Tray Line Team Leader.  Plaintiff's deposition testimony and sworn affidavit indicate that the majority of Plaintiff's time as Tray Line Team Leader was spent doing non-exempt work. (Carhuapoma Dep. at 42:8-43:15 (Plaintiff plated food when there were callouts, which was nearly every day); Carhuapoma Aff. at ¶ 25 (Plaintiff spent "7.5 hours per day of [his] twelve-hour shift . . . plating food").)  Plaintiff's contention that he spent the majority of his time as Tray Line Team Leader is hotly disputed.  (*See* DeFillipo Aff. at ¶ 4 ("To the extent Mr. Carhuapoma is attempting to portray his role as Team Leader as no different from members of the staff and to support a claim that he was a manual laborer, his statement is grossly misleading insofar as he is advising the Court that he worked on the tray line on a daily basis.").)  While it is true, as Defendant notes, that Plaintiff did not testify in his deposition that he spent the majority of his time as a Tray Line Team Leader doing exempt work, neither does anything in his deposition affirmatively contradict that statement.  *Cf. Golden v. Merrill Lynch & Co., Inc.*, No. 06 Civ. 2970 (RWS), 2007 WL 4299443, at *9 (S.D.N.Y. Dec. 6, 2007) (striking an affidavit that "stark[ly]" contradicts earlier deposition testimony).  Thus, at this stage of the litigation, Plaintiff is entitled to an inference that he spent over 60 percent of his time while working on the tray line performing non-managerial

tasks. *Accord McClellan v. Smith*, 439 F.3d 137, 144 (2d Cir. 2006) ("It is a settled rule that '[c]redibility assessments, choices between conflicting versions of events, and the weighing of evidence are matters for the jury, not the court on a motion for summary judgment.'" (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir.1997)).)

A finding that an employee spends less than fifty percent of his time on exempt duties is "not dispositive, albeit that it weighs against [the employer's] position." *Donovan v. Burger King Corp.*, 675 F.2d 516, 521-22 (2d Cir. 1982). "Generally," however, "exempt executives make the decision regarding when to perform nonexempt duties . . . ." 29 C.F.R. § 541.106(a); *see also Indergit*, 2010 WL 1327242, at *10 ("Whether Plaintiff's performance of non-exempt duties was mandatory or discretionary is of critical importance in deciding whether Plaintiff was correctly classified as an exempt employee."). Without a more fully developed factual record, this Court cannot determine that Plaintiff had discretion in deciding when he performed his non-managerial duties on the tray line. *Accord id.* The fact that Plaintiff worked on the tray line only when there were not enough people to plate food, however, suggests that he may well have lacked this type of discretion.

Moreover, exempt executives who spend the majority of their time performing non-managerial duties also tend to perform their managerial and non-managerial duties concurrently. *See, e.g.*, *Jones v. Virginia Oil Co.*, 69 F. App'x 633, 637 (4th Cir. 2003) (summary judgment was appropriate despite the fact that the plaintiff spent the majority of her time on "basic line work tasks," because she "could simultaneously perform many of her management tasks"); *see also* 29 C.F.R. § 541.106(a). In this case, however, the record is far from clear on the issue of whether Plaintiff was able to perform his managerial and non-managerial tasks concurrently while on the tray line. Indeed, there is some evidence in the record suggesting that Plaintiff could

17

not effectively perform his managerial duties while working alongside his assistants.  (*See* Carhuapoma Dep. at 42:16-22 (testifying that "it was hard to supervise" subordinates while Plaintiff was "working on the line").  *Accord Johnson*, 604 F. Supp. 2d at 914 (determining that the plaintiff's duties were not primarily managerial in part because he "could not easily stock shelves and simultaneously supervise employees . . . " (citing *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1272-73 (11th Cir. 2008)).

### iv.    Conclusion

The percentage of time that Plaintiff spent on managerial versus non-managerial duties weighs heavily in favor of a determination that Plaintiff's duties were primarily managerial when serving as a Cafeteria Team Leader and modestly in favor of a determination that Plaintiff's primary duty was managerial while serving as a Kitchen Team Leader.  By contrast, this factor weighs strongly against Plaintiff's work while serving as a Tray Line Team Leader being considered primarily managerial.  It must next be determined how, if at all, the other factors enumerated in § 541.700(a) affect the analysis of Plaintiff's primary duty.

### b.    Relative Freedom from Supervision

Questions concerning an employee's freedom from supervision and his level of discretion can also be decisive to a determination of whether an employee's responsibilities are primarily managerial.[7]  Employees may not be exempt, even if they perform managerial tasks, if they "d[o] so largely pursuant to the dictates of immutable corporate policy or at the behest of the . . .

---

[7] Unlike prior DOL regulations (*see* 29 C.F.R. § 541.103), the 2004 amendments to the FLSA regulations no longer identify discretion in decision-making as a distinct consideration in determining whether an employee's duties are primarily managerial.  An employee's discretion is nonetheless "often considered 'part and parcel' of whether an employee enjoys freedom from direct supervision."  *Scott v. SSP Am., Inc.*, No. 09 Civ. 4399 (RRM) (VVP), 2011 WL 1204406, at *11 n.13 (E.D.N.Y. Mar. 29, 2011) (citation omitted).

Manager to whom [they] report[]." *Clougher*, 696 F. Supp. 2d. at 288; *see also id.* at 292 ("Both freedom from supervision and the exercise of discretionary authority contemplate decisions of the kind and quality normally made by persons formulating policy within their spheres of responsibility, or who participate in this process, or who exercise authority to commit the employer in a substantial respect, financial, or otherwise.")[8]   Nonetheless, the Second Circuit has made clear that an employee can be exempt even if his discretion is "circumscribed" by a guidebook or supervisor, as long as, despite the circumscription, "judgments must still be made" by that employee.  *Donovan*, 675 F.2d at 521-22.[9]

---

[8] The reasoning in *Clougher* comports with DOL's interpretative regulation on "USE OF MANUALS," which provides:

> The use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption under section 13(a)(1) of the [FLSA] or the regulations in this part. Such manuals and procedures provide guidance in addressing difficult or novel circumstances and thus use of such reference material would not affect an employee's exempt status. The section 13(a)(1) exemptions are *not available, however, for employees who simply apply well-established techniques or procedures described in manuals or other sources within closely prescribed limits to determine the correct response to an inquiry or set of circumstances.*

29 C.F.R. § 541.704 (emphasis added); *see also Colyer v. SSC Disability Services, LLC*, No. 11 Civ. 20984, 2012 WL 882500, *7-8 (S.D. Fla. Mar. 12, 2012) (reading § 541.704 to mean that an employee's "reliance on clear and specific guidelines . . . seems to militate toward a finding that she was not exempt [under a section 13(a)(1) exemption], depending on how 'closely prescribed' by guidelines her actions were").

[9] In *Donovan*, the Second Circuit held that there was a sufficient level of discretion for the assistant managers' work to be primarily managerial where plaintiffs scheduled employee work hours based on business estimates, where there were some instances of hiring and firing on the record, and where employees ordered supplies "based on their own judgments." *Id.* at 521; *see also Scott v. SSP Am., Inc.*, No. 09 Civ. 4399 (RRM) (VVP), 2011 WL 1204406, at *11

Plaintiff testified in both his deposition and affidavit that he was closely scrutinized by his supervisor during the entirety of his employment at the Hospital, and was rarely the employee in charge on site.  (*See, e.g.*, Carhuapoma Aff. at ¶ 12.)  In conducting many of his duties, including meeting with his employees, overseeing the plating or preparation of food, or requesting overtime for his employees, Plaintiff abided by strict policies and procedures, the application of which left little room for independent judgment.  (*See* Carhuapoma Dep. at 26:18-22 (testifying that it was not "part of [his] protocol" to "take any initiative . . . to try to rectify [a] problem"); *see also* Carhuapoma Aff. at ¶ 17 (explaining that "while working in the cafeteria, Ms. Alvarez created a manual that details the specific utensils an employee should use when scooping out food for patrons.  I needed only to compare the utensils an employee was using against the manual to determine if they were performing their duties properly").)

While evidence in the record does suggest that Plaintiff was closely supervised and often lacked a significant amount of discretion, it is not the case that Plaintiff lacked complete authority to make any managerial judgments.  For instance, the undisputed facts indicate that Plaintiff was forced to make some judgments while completing the performance evaluations of his subordinates.[10]  *But see Johnson*, 604 F. Supp. 2d at 914 (noting that completing performance

---

(E.D.N.Y. Mar. 29, 2011) (determining that a plaintiff had sufficient freedom from supervision where he "had to use good judgment regularly").

[10] Plaintiff argues that "completing job evaluations for the employees that reported to me" merely required "match[ing] an employee's performance against [the] Hospital guidelines and select[ing] the performance rating that matche[d], without engaging in much subjective analysis, of the employee's performance."  (Carhuapoma Aff. at ¶ 12.)  However, many of the criteria laid out in the guidelines are not of a type that can be "matched" to an employee without analysis.  For example, Plaintiff had to determine whether his subordinates "t[ook] responsibility for actions and results" and whether they were "viewed by others as accessible and approachable."  (Lee Aff., Ex. K at 2.)  Such determinations necessarily require subjective judgment calls by the reviewer.

evaluations does not necessarily involve a significant level of discretion).  Despite the fact that Plaintiff had some level of discretion in certain discrete areas, however, genuine disputes of material fact exist as to whether overall Plaintiff had a level of discretion consonant with an employee whose duties are primarily managerial.  Because Defendant has the burden of proving that Plaintiff is exempt, this factor weighs against summary judgment.

### c.       Relative Importance of Exempt and Non-Exempt Duties

The relative importance of an employee's exempt and non-exempt duties can be "critical" to determining if an employee's work is primarily managerial.  *Indergit*, 2010 WL 1327242, at *6.  Because this is a "difficult and intensive factual inquiry," however, "[m]any courts have held" that determining the relative importance of an employee's exempt and non-exempt work "is inappropriate at summary judgment." *Id.*

There is some evidence in the record indicating that Plaintiff's managerial duties exceeded in importance his non-managerial duties.  In particular, Plaintiff's Performance Reviews, which include self-evaluations by Plaintiff, predominantly discuss Plaintiff's performance of his managerial duties, suggesting that Plaintiff was primarily of value to the Hospital as a manager. (*See generally* Lee Decl., Exs. L-O.)  More specifically, the reviews emphasize Plaintiff's management and coaching of his subordinates.  (*See, e.g.*, Ex. M at 2 (where Plaintiff writes that he "expects all employees to use more than basic sanitary measures" and "always makes sure they wash their hands before they cook and during food preparation to ensure the safety of each meal"); *id.* at 6-7 (Plaintiff received a rating "Exceptional" for "Managing People" and ratings of "Strong" for "Coaching and Developing Others" and "Decision Making"); Ex. N at 5 ("[Plaintiff] does a good job by providing feedback, instruction, and development guidance to help others excel in their current job responsibilities . . . .").)

21

Be that as it may, the Performance Reviews also indicate that Plaintiff's manual labor was of value to the Hospital.  (*See, e.g.*, Ex. L at 2-3 (noting that the Hospital has had "challeng[es]" with "staff shortages" and that Plaintiff "has worked both entrée stations on the train line by himself when short staffed.")  Moreover, Plaintiff has proffered some evidence indicating that Defendant overstates, at least in part, the importance of some of Plaintiff's duties.  (*See, e.g.*, Carhuapoma Dep. at ¶ 10 (affirming that, contrary to the assertions of the Hospital's witnesses, testing subordinates was a negligible part of Plaintiff's responsibilities).  Additionally, there is some danger in assuming that performance evaluations provide a complete picture of an employee's duties.  *Accord Johnson*, 604 F. Supp. 2d at 923.

Ultimately, factual issues remain concerning the relative importance of Plaintiff's managerial and non-managerial work, again weighing against summary judgment.  *Accord Indergit*, 2010 WL 1327242, at *6 (the inability of the Court to determine the "relative importance of [exempt] duties versus the non-exempt duties" weighs against summary judgment).

### d.    Plaintiff's Salary versus Salaries of His Subordinates

The final factor to be considered when determining whether an employee's duties are primarily managerial is the difference between Plaintiff's salary and that of non-exempt employees.  In order to determine the differences between the salaries of exempt and non-exempt employees, courts frequently compare the weekly salary of the exempt employee to those of his subordinate, non-exempt employees; in other words, courts "reduce[] the [exempt employee's] weekly salary to an hourly rate of pay by dividing the salary by the number of actual hours worked," and then compare that hourly rate to "the hourly rate of subordinate employees." *Johnson*, 604 F. Supp. 2d at 918 (citing *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 508-09 (6th Cir. 2007)); *see also Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1257-58

(11th Cir. 2008) (comparing the hourly wages of groups of employees rather than annual salaries to account for differences in hours worked per week).

Despite having the burden here, Defendant does not address this factor in its briefs, and the evidence in the record is spare. Defendant has submitted evidence demonstrating that Plaintiff's salary in 2009 "exceeded $46,000, whereas the average cook or production assistant in the kitchen at the time made $39,100," (DeFilippo Aff. at ¶ 8.) Evidence concerning the average number of hours Plaintiff worked as compared to non-exempt employees, however, is sorely lacking.[11] Indeed, the evidence proffered by Defendant regarding the hours worked by Plaintiff indicate that he worked *longer* hours than his subordinates. (*See, e.g.*, Lee Aff. at ¶ 18; *see also* Carhuapoma Dep. at 23:21-24 (stating that he worked shifts over 13 hours in length in the kitchen)). Because it is Defendant's burden to demonstrate that Plaintiff should be exempt, Defendant's failure to show conclusively that Plaintiff's hourly wage was greater than that of non-exempt employees weighs against summary judgment.

### e.    Conclusion

In sum, while the percentage of time Plaintiff spent on managerial versus non-managerial duties militates towards a determination that Plaintiff's duties were primarily managerial while he was serving as a Kitchen and Cafeteria Team Leader, the remaining three relevant factors weigh against a determination as a matter of law that Plaintiff's duties at the Hospital, in any of his three Team Leader positions, were primarily managerial. Therefore, weighing all of the factors set forth in § 541.700(a), the Court concludes that Defendant cannot meet its burden, at the summary judgment stage, of proving that Plaintiff's duties were primarily managerial.

---

[11] Plaintiff's earning statements all indicate that he worked "75.00" hours over a given two week period (Lee Aff., Ex. B); common sense, as well as Plaintiff's testimony that he did not clock out at the end of the work day, prevent this figure from being considered.

23

### 2.     Recommendations Given Particular Weight

The parties also dispute whether Defendant can meet its burden of demonstrating that Plaintiff either had "the authority to hire or fire other employees" or made "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees" which were "given particular weight." 29 C.F.R. § 541.100(d).  The record suggests that Plaintiff lacked the authority to hire or fire.  Plaintiff did, however, fill out employee evaluations, and Defendant argues that these were given "particular weight" by Plaintiff's superiors and had a direct effect on the salaries of Plaintiff's subordinates, a contention Plaintiff disputes. (Def.'s Mem. at 12-14; Pl.'s Opp'n. at 13-15.)

Because it has been determined that genuine issues of material fact exist as to whether Plaintiff's duties were "primarily managerial," the Court declines to reach the question whether "suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees" which were "given particular weight."  It is worth noting, however, that genuine disputes of material fact exist as to whether Plaintiff even filled out any such evaluations while serving as a Tray Line Team Leader.  (*See* Carhuapoma Dep. at 96:11-14.) Thus, irrespective of whether the employee evaluations filled out by Plaintiff were given "particular weight," Defendant has failed to meet this requirement under § 541.100(a)(4) as to Plaintiff's stint as a Tray Line Team Leader.

### B.     Administrative Exception

Defendant also contends that Plaintiff's claim fails under the administrative exemption as a matter of law.  "The Second Circuit has indicated a very narrow interpretation of the FLSA administrative exemption, and this court's holding can be determined only upon a clear finding of facts." *Harper v. Gov't Employees Ins. Co.*, 754 F. Supp. 2d 461, 466 (E.D.N.Y. 2010).  Again,

"the employer invoking the exemption bears the burden of proving that its employees fall within the exemption." *Reiseck*, 591 F.3d at 104.

A salaried employee is exempt under the administrative exemption if his primary duty (1) "is the performance of office or nonmanual work directly related to the management or general business operations of the employer or the employer's customers," and (2) "includes work requiring the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(2),(3).

To meet the first requirement, an employee's primary duty must entail "work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment."  29 CFR § 541.201(a); *see also Davis v. J.P. Morgan Chase & Co.*, 587 F.3d 529, 532 (2d Cir. 2009) (noting that the key to this portion of the analysis is to "identify [the employee's] job as either administrative or production").  Examples of office or nonmanual work include

> work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities

29 CFR § 541.201(b).  Plaintiff contends that he spent only several minutes per day performing administrative duties.  And indeed, while Plaintiff perhaps did some budgeting, purchasing, and other such tasks, there is little evidence in the record that these administrative functions, rather than the production of the Hospital's food services, constituted his primary duty.  Defendant has thus fallen short of demonstrating, as a matter of law, that Plaintiff's "primary duty" constituted

such office or nonmanual work.  *Accord Cohen v. Gerson Lehrman Grp., Inc.*, 686 F. Supp. 2d 317, 329 (S.D.N.Y. 2010) ("It is, indeed, the case that, in a service-industry setting, the determination of whether an employee's responsibilities fall within the 'administrative' or 'production' category will often require a fact-intensive analysis of employee functions.")[12]

**III.    Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment is DENIED.

The Clerk of the Court is directed to terminate the Motion at Docket Number 19.

SO ORDERED.

Dated:  New York, New York
          March 29, 2013

_____
J. PAUL OETKEN
United States District Judge

---

[12] Because Defendant has failed to show that Plaintiff's primary duty "is the performance of office or nonmanual work directly related to the management or general business operations of the employer or the employer's customers," the Court need not examine in depth whether Plaintiff's work primarily "includes work requiring the exercise of discretion and independent judgment with respect to matters of significance."  It should be noted, however, that Defendant has also failed satisfy this requirement as a matter of law.  Simply stated, there is a genuine dispute of material fact as to whether Plaintiff had the "authority to make an independent choice, free from immediate direction or supervision."  § 541.202(c).